| | |
|---|---|
| Lori R., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> Nancy A. Berryhill, Acting ) <br> Commissioner of Social Security, ) <br> ) <br> Defendant. ) | No. 18 CV 50002 <br> Magistrate Judge Iain D. Johnston |

## **MEMORANDUM OPINION AND ORDER**[1]

Plaintiff is seeking disability benefits based on chronic tailbone pain (coccydynia) that began after she gave birth to her second child in 2007 and has remained since then despite multiple treatments and medications. Plaintiff alleges she cannot sit for extended periods.

This is the second appeal to this Court. In 2012, plaintiff filed her disability application. In 2014, the ALJ held an administrative hearing at which Dr. Ronald Semerdjian testified as the medical expert. A month later, the ALJ issued a decision finding plaintiff was capable of light work, meaning she could sit for six hours a day.

Plaintiff appealed that decision to this Court, raising two arguments. The first and primary argument was that the ALJ failed to adequately consider two pieces of evidence that plaintiff believed strongly supported her claim. These were functional capacity evaluations ("FCE"), one in August 2012 and the other in September 2014.[2] Most helpful to plaintiff is the

---

[1] The Court will assume the reader is familiar with the basic Social Security abbreviations and jargon.
[2] *See generally Estes v. Colvin*, 2016 WL 1446218, *6, n.2 (N.D. Ill. Apr. 11, 2016) (a functional capacity evaluation is a "detailed series of functional tests, typically performed by a physical or occupational therapist over a period of four to six hours, intended to ascertain an individual's ability to perform specific job-related tasks").

1

finding from the 2014 FCE stating that she could only work four hours in one day. The ALJ gave little weight to the FCEs because (according to the ALJ) they relied, "at least in part, on the claimant's own subjective perception of her limitations." R. 26. In her opening brief to this Court, plaintiff raised multiple arguments attacking this conclusion. She noted, for example, that the 2014 FCE "was deemed valid by both the therapist who administered the test and by Dr. Semerdjian" and that Dr. Semerdjian "clearly testified that he was not questioning the results and in fact, noted that nothing in the FCE results questioned Plaintiff's effort or found her to be malingering." Case No. 16-50025, #12 at 10-11.

After reviewing plaintiff's opening brief, the Government agreed to a voluntary remand, thus implicitly recognizing plaintiff's arguments had some merit. The case was remanded without any substantive ruling by this Court.

The first step after remand was a review by the Appeals Council, which then issued a three-page order outlining the issues that the ALJ should address in a new hearing. Relevant to this appeal, the Appeals Council directed the ALJ to address the two FCEs. The Appeals Council questioned the ALJ's finding that the FCEs were "based on [plaintiff's] subjective complaints rather than the actual results of the examination." R. 662.

In August 2017, the ALJ conducted a second hearing. A new medical expert, Dr. Ashok Jilhewar, testified. He offered a somewhat different and more complicated two-part assessment. He first concluded that plaintiff qualified as disabled from the onset date (January 2011) up until September 5, 2014. The rationale was that plaintiff medially equaled Listing 1.04(c) because she had undergone intense treatment during this period. *See* R. 637 (referring to the "intensity of management" of plaintiff's pain). Dr. Jilhewar explained, for example, that plaintiff had tried several neurostimulators. In the second part of his analysis, Dr. Jilhewar found that plaintiff no

longer equaled Listing 1.04(c) beginning on September 6, 2014 because, from this point onward, plaintiff's condition had improved sufficiently such that she could work full-time. When asked what evidence supported the improvement theory, Dr. Jilhewar stated that plaintiff's pain medications had been "lowered." R. 638. However, Dr. Jilhewar made one concession to plaintiff's allegation of pain when sitting. He stated that he "expected [her] to use a so-called donut pillow, so that her tailbone will not touch the floor of the chair."[3] *Id.*

On October 27, 2017, the ALJ issued his second decision, again finding plaintiff not disabled. The ALJ adopted Dr. Jilhewar's two-part framework resting on the central finding that "[m]edical improvement occurred as of September 6, 2014." R. 600. The ALJ amplified and added to Dr. Jilhewar's explanation at the hearing. The ALJ noted that plaintiff "went two years [after September 5, 2014] without any pain management;" that she had many normal examinations after September 5, 2014; that her medications had controlled her pain; and that she did various household activities. R. 601. The ALJ also referred to part-time work plaintiff had done at UPS for several months in late 2016. As for the two FCEs, the ALJ only provided the following statement at the end of the decision:

> Finally, little weight has been given to the two functional capacity evaluations as both were performed prior to September 6, 2014, and therefore do not show her level of functioning beginning September 6, 2014 and continuing through the date of this decision.

R. 604.

The gist of plaintiff's argument is that the one-sentence analysis above commits the same error (*i.e.* inadequate analysis) leading to the first remand. In its brief, the Government does not attempt to defend the adequacy of this one particular sentence, thus implicitly conceding it is inadequate on its own. Instead, the Government asks this Court to apply "a common-sense

---
[3] The Court did not notice any references earlier in the record to this remedy of using a donut pillow.

3

reading to the entirety of an ALJ's decision" by considering the ALJ's broader rationales. *Winsted v. Berryhill*, 915 F.3d 466, 472 (7th Cir. 2019).[4] The Government believes that these rationales indirectly explain why the ALJ gave little weight to the FCEs. However, even reading the ALJ's decision charitably, the Court finds that plaintiff has still raised valid concerns about whether the ALJ adequately considered the FCEs and, more broadly, about why the ALJ found that plaintiff improved as of a certain date.

The major stumbling block in understanding the ALJ's decision is determining why the ALJ (or perhaps Dr. Jilhewar) chose the precise date of September 6, 2014 as the magical date on which plaintiff improved. Other dates were possible.[5] It does not take an astute reader to notice a striking juxtaposition. The second FCE was dated September 5, 2014—just one day before the ALJ's improvement date. A suspicious reader naturally will wonder whether the ALJ (or Dr. Jilhewar) cherry-picked this date for the specific reason of not having to confront the second FCE. The ALJ never discussed the substance of the September 5, 2014 report. The ALJ did not, for example, suggest it was unreliable because plaintiff gave poor effort or was malingering. Likewise, the ALJ did not return to his previous rationale that the FCEs relied on subjective statements. Instead, the only rationale offered was that the FCEs were temporally irrelevant.[6]

But to return to the original question: why did the ALJ choose this particular date? There does not appear to be any triggering event, either on this specific day or during this month

---

[4] This "common sense reading" defense appears to be the Government's new favorite argument when confronted with assertions that an ALJ's analysis was inadequate. These arguments are akin to forbidden *Chenery* post-hoc justifications by the Government on appeal. These arguments are also reminiscent of the refrain from the old Prego commercial: "It's in there."
https://www.youtube.com/watch?v=2J87QekxQVI

[5] Plaintiff chose January 2011 as her onset date, and the second hearing took place in August 2017.

[6] No doubt, coincidences happen. But asking a reasonable person to believe that plaintiff suddenly improved just one day after the second FCE without any explanation is too much.

or even year indicating improvement had taken place. For example, there was no contemporaneous MRI or a significant medical visit around this time insofar as this Court can determine. As plaintiff persuasively writes in her brief, the record does not suggest there was any "spontaneous, dramatic improvement that occur[red] overnight after the day of the [second] FCE." Dkt. #10 at 14. The second FCE was plaintiff's strongest piece of evidence. So how was it that the very next day plaintiff could suddenly do eight hours of work rather than four?

The Government argues that the answer can be found in the ALJ's broader rationales. These include a two-year treatment gap, normal examination findings, and plaintiff's activities. The ALJ found that plaintiff showed improvement in these three categories after September 5, 2014. The ALJ was essentially proposing a before-and-after comparison tied to the cut-off date. But a closer inspection of the record raises doubts about whether there was truly any change on this chosen date. This can be seen by looking at the "before" part of the comparison.

Consider first the two-year treatment gap after September 5, 2014. The problem is not that the ALJ was factually wrong in noting this gap; rather, it is that he failed to acknowledge the fall-off in treatment began over a year *before* September 2014. Therefore, there was a similar treatment gap before the cut-off date. To recap the relevant history, plaintiff's tailbone pain began in 2007. Over the next four years, she tried numerous treatments with a series of doctors. Then, in February 2012, she began treatment with Dr. Thomas Dahlberg, a pain specialist, who concluded that her current treatments were not working. He removed her dorsal column stimulator and "weaned her off of her opioid medications." R. 529. But after these steps were taken, plaintiff reported that "her pain is no better and no worse." *Id.* Dr. Dahlberg concluded that she had "failed almost all conventional medication treatments." R 537. In September 2012, he summarized as follows:

> I told the patient that at this juncture I recommend permanent disability as I do not think she would be able to maintain any meaningful employment with her frequent needs to lie down on a flat surface. I have told her to check in with me periodically, probably on a yearly basis, to see if there are any advancements available, but at this point I think we have maximized treatment options for her.

R. 541. This history suggests that it was at this point—sometime around September 2012—when the treatments slowed down and the treatment gap began. Thus, although there was a treatment gap, it did not provide support for the ALJ's selection of September 2014 as the improvement date. If anything, it suggests an earlier date.

There is a broader, separate issue regarding the lack of treatment rationale. Plaintiff argues that the ALJ failed to inquire into possible explanations for why she did not seek additional treatment. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for lack of medical care before drawing a negative inference"). Plaintiff argues that the explanation was that she had "exhausted her medical options" and there was "nothing else to do for her." Dkt. #16 at 6. This is a potentially valid explanation. Although plaintiff was not asked about this at the hearing, either by the ALJ or by her counsel, plaintiff did offer this explanation in several statements submitted to the agency. *See* R. 227 ("The doctor told me in 2012 there was nothing left to do for me."); R 766 ("Dr. Dahlberg says there is still nothing new to treat the problem."). Also, as noted above, Dr. Dahlberg stated that plaintiff had "maximized treatment options" in the summer of 2012. R. 541. Likewise, Dr. Semerdjian testified at the first hearing that that plaintiff's pain had "been resistant to any modalities of treatment." R. 58. Neither Dr. Dahlberg nor Dr. Semerdjian identified any viable treatments options that had not been tried already.

Turning next to the normal findings. This rationale also fails when the "before" period is considered. As Dr. Jilhewar testified, plaintiff had normal examinations throughout the *entire period* under consideration—*i.e.* both well before and after September 5, 2014. *See* R. 634 ("from the clinical perspective, her pain clinic physicians, primary care provider, consistently write that the musculoskeletal system and neurological system is normal."). Dr. Jilhewar referred specifically to several MRIs from May 2012 showing normal results. *Id.* These were over two years before the alleged improvement date. Dr. Dahlberg, as well as the Agency physicians, also stated that plaintiff consistently had normal examinations throughout the entire period. R. 380. Although this fact arguably weakens plaintiff's overall claim. by suggesting she was never disabled at any time, it does not provide a reason for choosing September 6, 2014 as the specific date when she suddenly became able to work.

Turning finally to plaintiff's daily activities, the ALJ noted that plaintiff was "taking care of two young children and four cats," doing laundry, driving, shopping, watching television, and doing other similar activities. R. 602. But here again, this rationale does not support the improvement theory. Nothing suggests that plaintiff's ability to do these activities started *after* the improvement date. Instead, the record shows that plaintiff had been doing these activities well before then. The proof is simple. The ALJ relied on plaintiff's Adult Function Report in making this point. *See* Ex. 5E. But this document is dated November 5, 2012. Again, the timing is off.

There is one more rationale that should be addressed. The ALJ repeatedly referred to plaintiff's part-time work at UPS in late 2016 as evidence that she could work full-time. The Government also mentions this fact often in its brief. *See* Dkt. #15 at 10 ("her successful efforts to work at UPS"). However, plaintiff argues that this evidence equally supports her argument

because it shows that she could only do part-time work, which fits with the finding from the second FCE that she could work only four hours a day. Plaintiff notes that she mostly worked 3-hour shifts, with an occasional double shift totaling 5 hours with an hour break in the middle, and further notes that this work created greater pain requiring additional pain medications. It is thus not clear why this part-time work was inconsistent with the FCE. Perhaps the ALJ believed that it was inconsistent with plaintiff's testimony in some way, but if so, the ALJ needs to provide a better explanation. This is another issue that should be addressed in greater depth on remand.

The Court finds that the above concerns are sufficient to justify a remand.[7] To summarize, the Court agrees with plaintiff's specific argument that the ALJ again insufficiently addressed the FCEs. The ALJ must provide a more detailed analysis and fully confront this evidence. As plaintiff notes, there is ambiguity about whether the ALJ merely believed that the FCEs were out of date or whether the ALJ also believed that they were invalid in some respect. More broadly, the Court finds that the ALJ's improvement theory is not adequately grounded in the medical chronology. Perhaps a later or earlier date would be more defensible. It is also not entirely clear why the ALJ and Dr. Jilhewar found that plaintiff equaled Listing 1.04(c), a provision focusing on ambulation. It is true that the Government did not specifically challenge that finding, but it is linked to the later one because the improvement rationale rests on a comparison between these two time periods. Given that this case is being remanded for a third hearing and decision, the Court strongly encourages the ALJ and plaintiff to carefully consider and explore all relevant issues. In particular, plaintiff's counsel should explicitly raise all her

---

[7] The parties debate a few other assertions ostensibly supporting the ALJ's improvement theory, but they are relatively minor in comparison to the rationales already discussed and would not change this Court's decision.

8

arguments to the ALJ both in a pre-hearing brief and during the hearing itself. If counsel fails to do so, the Court will find that those arguments have been forfeited in any subsequent appeal.

For the above reasons, plaintiff's motion for summary judgment is granted, the Government's motion is denied, and the case is remanded for further proceedings.

Date: May 24, 2019  By: _____
Iain D. Johnston
United States Magistrate Judge